Millennium Inorganic Chemicals Limited v. National Union Fire Insurance Company of Pittsburgh and Mr. Cole, when you're ready. May it please the Court, I am Charles Cole appearing today on behalf of the two defendants. The plaintiff in this case, Millennium, is attempting to collect on insurance for which it never bargained. In its original request for proposals, it sought contingent business interruption insurance based on direct suppliers. The insurers responded accordingly, first with bids saying no indirect suppliers and then with policy language saying restricting the coverage to direct suppliers or direct contributing properties. But Millennium is now seeking coverage for an incident in a company that had no commercial relationship at all with Millennium, much less a direct one. Millennium bought its gas from Alinta. Alinta bought 20% of its gas from Apache. Millennium had no contract at all with Apache. The purchasing manager at Millennium- Who owned the pipeline? Different third parties, neither one. The purchasing manager at Millennium admitted that he had- The gas went from various gas fields, 20% from Apache, but from other gas fields into this pipeline owned by a third party- Correct. Down to- 1,500 kilometers into another pipeline- Millennium. And then to Millennium. And the gas that was coming through the pipelines is gas from multiple fields and Alinta has an interest in what it purchased, but it's fungible, it's intermingled with other people's gas. That's correct. And the pipeline- Okay. Now, in fact, what I was going to say is- Whatever gas is in that pipeline is owned by Alinta. Yes, it is. It's not owned by the Apache or whoever else pumped the gas. That's correct. Tidal and risk of loss is transferred to Alinta when it enters the pipeline. Now, before you get into the policy too much, there was a binder in here. Yes. And I understand under New York law, until the policy comes out, the binder controls. Yes. And this case could be decided- And nobody made an argument or briefed that. Yes. It could be decided that way and the binder said no indirect suppliers. I understand what the binder said, but I'm trying to find the role of the binder. Well, I think the binder could be viewed as binding here. The policies elaborate on what the binder may have meant and so are relevant in that regard. But I think the binder and the policies are- But you didn't argue that in the brief and you didn't argue that in the district court. We do mention that in the brief, but it was not the focus below. And because the policies elaborate on the meaning of the binder, I guess the policies are relevant in that regard. The law occurred during the binder's application and New York law specifically addresses this and says the binder's language should control on that. Yes. Yes. And it said no indirect suppliers. So it leads to the same point. How do you address Judge Agee's question? Are we to consider that? Is that some new issue I'm raising here with you on appeal? I think it could be raised, but I'm not sure that it helps because I think it leads us to the same point, which is no indirect suppliers, there must be a direct supplier. Well, let's put it a different way, not to belabor this too much. Can you point us to somewhere in the appendix where you asked the district court to rule in your favor based on the language in the binder? My impression is that it wasn't argued that way. So the answer would be no. No. But I think the existence of the binder, the language of the binder, were put in front of the district court. Now, the purchasing matter, the purchasing matter, the point that I was wanting to come back to is the relationship between Millennium and Apache. The purchasing manager at Millennium never asked where the gas was coming from, where Olinta got its gas. So that purchasing manager did not know anything about Apache. These facts you're going to go to, I understand them, it basically is who's direct and who's indirect, but the policy doesn't use people, it uses property. And so if you're looking to the direct contributing property, you would look to the pipeline, and if there were an explosion of the pipeline or damage to the pipeline that interrupted the gas, that would be direct because the pipeline is the contributing property. And I'm not sure that's, you blur property with supplier, and maybe you're right, but I must say, I find the language peculiar. I don't know if it's ambiguous, but I find it peculiar. Well, I think a contributing property is a property that contributes goods. I don't know whether the pipeline would... Well, I don't see properties getting up and walking around contributing goods. I understand that property is the vehicle by which the goods are delivered, and it says direct contributing property. Isn't that what the language of the policy is? Yes, but the language is also those direct contributing properties must be direct suppliers. In Section B of the endorsement, it says specifically they must be direct suppliers. And the question is whether a pipeline is a supplier, and that may be a push to get there, but we don't need to reach that issue. It shouldn't be a push from your point of view. That's your best argument. The pipeline is the contributing property to your property, and the pipeline, if a pipeline explodes and interrupts gas, there's coverage. But if the pipeline, if it's something beyond the pipeline that causes the interruption, then it's not a direct contributing property. Well, we certainly agree that if there's something intervening, whether it's a pipeline or a Lenta, then it's not a direct supplier relationship. Your main argument has always come down to that Lenta is independent of Apache. Right. Okay. That's the way we argued it. And I think the answer to the question, the question here is, can you have a direct relationship between two companies when each company has not heard of the other? We say no based on the express language of the policy, which says direct means, and direct has a relevant dictionary definition of having no intervening persons, conditions, or agencies. Here there was one, as we've discussed, a Lenta, which took title and was responsible and had the risk of loss for the gas through the entire move through this 1,500-kilometer pipeline. Now, this is exactly the kind of relationship that the U.S. Supreme Court has characterized as indirect in the gas industry. In a 1990 case, the Supreme Court dealt with this in terms of the Illinois BRIC, direct indirect purchaser doctrine. And it said the consumers in this case have the status of indirect purchasers. They bought the gas from utilities, not from the suppliers. Well, Millennium is in exactly the same position. It is buying from an intermediary, not from the original supplier or producer. Millennium was an indirect purchaser, and by the same token, Apache was an indirect supplier. Now, that's then put into use in the ADM case, which deals specifically with contingent business interruption insurance. It's one of the few cases that did. It's the earliest case that did, and it's shaped the law ever since. In ADM, the company ADM purchased grain from dealers who in turn purchased it from farmers. The court said that the farmers were indirect suppliers and said the parties could have excluded them from coverage if it had used the word direct. Well, here the parties did exactly that. We've discussed it. The declarations use direct contributing properties, and Section B used direct suppliers. So the use of that language is important because when you look at a policy, you look at it from the point of view of a reasonably intelligent person who is familiar with the customs, usages, and terminology in the trade or business. In fact, the Second Circuit has held applying New York law that if there is case law that defines the meaning of a term, the parties are assumed to have incorporated that case law, and there will be found no ambiguity if the case law adequately defines the term. That's in the Hugo Boss case in 2001. So that's what we have here. We have case law that define these terms, and the parties incorporate that term direct, and there's no ambiguity in light of that case law. The district courts, well, the plaintiff tries to create an ambiguity by relying on a geometric definition, saying, well, direct means moving in a straight line or a straight course. That ends up to be completely fortuitous. The district court's theory is, well, it's the same gas being transferred. The problem with that is that was true in ADM, that was true in these Supreme Court cases, and they viewed it as an indirect relationship. The practical problem with it is that the insurance companies can't really underwrite once you start saying that any, as long as it's the same material being passed along in the supply chain from a fifth tier to a fourth tier to a third tier up to the customer, the insurance companies can't underwrite. They can't identify, they can't assess the risk because you go so many levels back. So that method doesn't work either, and the premise of it, the physical premise is in question because it's not really clear that the gas that was produced by Apache is the same gas that reaches Millennium. The findings by the district court itself suggest that it can't make that finding. So the district court shouldn't have ever entered into this factual inquiry. As a matter of established law, Apache was not a direct supplier because it had no commercial contract in the past, it had no contract in the current contract, and no contract in contemplation. And I would say by the same token, the problem of for the account of is resolved by the plain language and by the case law that came before. The Supreme Court has explained that a broker buys and sells securities as an agent for the account of customers in those transactions. It is the customer rather than the securities firm who bears the risk of loss. Here, in this case, Alinta bore the risk of loss when the gas was in the pipeline. Let me just ask in terms of understanding physically how this is happening. You've got the gas coming from Apache, and there's a pipeline that comes over to Millennium. And in the interim, there is this change of title ownership, I guess, to Alinta. But the fact of the matter is the gas goes through this pipeline directly to Millennium. And is there any other connection with Alinta other than it has the title? It has ownership, it has title, it has risk of loss, it has the right to decide where it would be sold, to whom it would be sold. And we don't really know that it is the same gas. Once it goes in the pipeline, it's commingled with everybody else's gas. Once it goes in the pipeline, is there any way for Alinta to stop it or to say, no, I'm not giving you this, I'm going to send it to this person? Or must it go, once it starts here, must it continue along? Well, it's all commingled, and it has to go to some location. Presumably, you can cut off gas, because that's exactly what happened here. There was a cutoff of gas. Does Alinta have title to all of the commingled gas? Yes. There's not another company involved in this? Oh, no. Well, I mean, I guess there could be other companies booking space on the pipeline. To that same pipeline? Yes. So it has this gas that there is going through, and I guess it's all really together, but it's just a percentage, I guess. And it's going through, and it has title to it. There's nothing you can do about that gas except let it just go through, and if you don't stop the title, you've got to stop it back here when it leaves from Apache, right? Well, it has the ability to cut off Millennium, and they did. Back at Apache? No, they didn't allow, because there were other customers. The gas didn't stop altogether. What happened here was that the gas went to residential customers and to essential services and not to Millennium by regulatory fiat. They prioritized where the gas would go in time of shortage, and they cut off Millennium. I mean, they did it out of necessity. I mean, they didn't have a choice. Right. They cut everybody off. It wasn't just Millennium, but it wasn't Alinta that cut them off. It was really, was it? No, it was Alinta at the direction of the regulatory authorities. From Australia? This Australia you were talking about? Yes, yes, in Australia, not here. I mean, that's the little slightly confusing thing. I'm trying to understand that little small point. It may not be a big deal, but at least in terms of understanding whether this is an ambiguity, you know, Alinta's whole actions, it's an unusual situation. It's almost ways in which we would deal with real estate. You actually would have title to something that you never even seen, but you would sell it in the process of it, which happens when you get an offer to purchase. You don't actually have it or whatever to do. But in this instance, it seems, I mean, you got this explosion that goes on, and this gas is actually coming straight from Apache on the Millennium, but then you've got this middleman that's here. Who owns the gas. And it really comes down to, is there an ambiguity in that particular business interruption type clause in interpreting? Is that within what the parties? Well, yes, but Alinium plays a critical role. It's aggregating the gas. It's negotiating the prices at one end and the prices at the other end. It's booking transport on the pipeline. It is assuming the risk. It's putting up its credit. And there is testimony, which is quoted in the district court opinion from the plaintiff's own expert, Chatfield, about the role that Alinta plays and shows that it plays economically an important role at several levels in some of the things I just described. Um, so Alinta is performing a significant role in the middle. Okay. We'll hear from you on rebuttal. Mr. Beavers. May it please the court. I'm Joe Beavers, counsel for appellees. I would like to just briefly discuss two primary reasons why Judge Highlander's ruling below should be affirmed. First, although Millennium has offered a reasonable interpretation of the policies at issue based on actual policy language, the insurers have not. Second. Well, how is how is millennia or how are your folks affected by direct supplier? Why is Apache a direct supplier? Because as that term is used in the policy, Your Honor, a direct supplier must be a direct contributing property. And under the facts of this case. Well, it says must be direct suppliers of materials from a contributing property. So how are how are they direct? It goes into this pipeline, which Apache doesn't own. It gets mixed with the gas of all these other people. You have no way of knowing whether any of the Apache gas ever gets to Millennium. How is that under any definition direct? We know that Millennium's operations shut down because a named peril occurred at Apache's location. Because that peril, an explosion occurred. Apache was completely shut down because Apache was completely shut down. Its direct supply of gas to Millennium's location ceased. Yeah, but it was it was clearly in causation chain. The damage at Apache was causative. But this policy doesn't cover damage for all causes. It covers for business loss resulting from damage to direct contributing properties. And it said those property those locations must be direct suppliers of materials. So whether you're looking at geographical properties, in this case, the direct property is the pipeline owned by somebody else or supplier, the direct supplier is Alinta. But in no case is the pipeline or Alinta, I mean, Apache, the direct supplier. It supplies to Alinta or its supply, its property supplies to the pipeline, if you're looking geographically. And I don't know how you get around that. It's a it's just beyond the risk. It's surely it caused it. But I would think if the pipeline blew up, we might have a different problem. But the gas transferred full title, fee simple, whatever you want to call it, to Alinta. Alinta had it commingled with other gas. It went to a property that was not Apache's property. It went to property that was not Alinta's property. And so you have an intervening property, the pipeline, and you have an intervening supplier, the Alinta. And so somehow you have to eliminate those two, don't you, to get coverage? Under the policy. Under the policy. Which focuses on contributing properties. I do not believe that we can conclude that the pipeline is a contributing property. Why not? Pipeline blows up. A truck hits the pipeline. There's a leak in the pipeline. That's a property. It's owned. It's physical. It's geographical. And it's owned by some third person. And the gas is contributed from that pipeline directly to Millennium. The pipeline here is akin to roads. Roads are property. And the insurers in this case certainly would not argue that if a supplier such as Alinta had a facility, and it was prevented from delivering some material to Millennium because there was an explosion on a roadway or a bridge, the insurers would not be able to argue that the direct contributing property in that situation was the road or the bridge. But Alinta is the direct supplier. Here, Alinta is the direct supplier. Disagree, Your Honor, because direct supplier is only referred to in this policy in one place, and it is within the context of direct contributing properties. Of course. It defines the two interrelate. And they're in the same provision. And you must figure something out. But that takes me to my binder question, which, if this weren't clear, the binder certainly is. And the binder, under New York laws, would control if you guys argued it. Now, I don't know whether it was argued below or considered below. But the binder says what? Direct suppliers. That issue was not argued below. Is that what the binder says? The binder says that CBI coverage is for direct suppliers. The insurance policy, which lays out all of the terms of coverage, seems to say the same thing in more awkward language. In extremely awkward language. I agree. But I don't think it does say the same thing. It talks about direct, unnamed, contributing properties. And here, to answer Your Honor's question regarding Alinta being a contributing property. Except the coverage refers up to the previous section. And that's headed up. The following locations must be direct suppliers of materials. It does, Your Honor. And Judge Hollander pointed out below. Millennium is not making the argument that there is no direct requirement. We are making the argument that a proper interpretation of the policy requires an interpretation of all of the policy language. And here, the insurers cannot get around the fact that this policy speaks in terms of direct contributing properties. That's the same. A direct contributing property would not be an indirect property. Apache's property. There are five or six properties up there contributing gas fields, contributing to the pipeline. There may be 20 properties. Those properties mine or bring up gas and put it in the pipeline. The pipeline merges. And it probably has exits to various places. But the pipeline is a different property than the Apache's property. And the pipeline property is owned by somebody else, indeed. And it's 1,500 kilometers long. And to answer your prior question, Your Honor, regarding Alinta being a contributing property. Well, I said Alinta is a direct supplier. A direct supplier. To that question. I would say the contributing property would be the pipeline. If that were isolated. But it's not isolated. You have to read on to it. They say the following locations, so they convert the geographical into the person doing the supplying, must be direct suppliers of material. Correct. And in this case, Alinta cannot be a direct supplier because they can't be a direct contributing property. Alinta owned nothing. Alinta did not own the pipeline. Alinta did not own the facility. Alinta did. They owned the material for a period of time. Apache produced the material. Apache's property was the property that. If you say Alinta, and I may agree with you that Alinta cannot be the contributing property, then the owner of the pipeline is a contributing property. But in either case, it doesn't bring in Apache. Apache doesn't come in under any of these definitions. I believe Apache does come in under a plain reading of the policy. Apache is the only essential link in this chain. If Apache had not suffered. It's an overstatement. Only a central link in this chain. In the context of this loss, your honor. Yes. Yes, there were other gas producers. Did Apache own the land on which the pipe flowed? I don't want to misstate. I believe Apache or one of the joint ventures with which it was affiliated owned the land. Apache owned the production facility. It operated. That's clear. But I thought the record showed that somebody else owned the pipeline. I apologize. I don't have a clear answer for that, your honor. Or initials or whatever it was. Does the pipeline go across water? I believe, yes, it does cross water. I thought it most of the time was across the water. Most of it across the water? Or does it connect up between Apache and Millennium? I don't know if most the majority of the pipeline. It is a long pipeline. I don't know if a majority of it cross is over water. The Apache production facilities were on Varanus Island. There was an explosion there. Because of that explosion, natural gas could not reach Millennium's facility. And Millennium's facility shut down. Well, it could reach it. It was the cost of the chain is a little more complex. There was gas going through the pipeline. But it was a reduced amount because it did not have Apache's contribution. Correct. There was no gas in the pipeline from Apache, the direct contributing property, where the named peril occurred. I know. But there was gas in the pipeline. It was shipped to other locations. There was gas in the pipeline from other potential contributing properties to Millennium's facility. And nothing in the policy, Your Honor, claims that Millennium can only have one direct contributing property or only one direct supplier. So the fact that there were multiple producers. In a given causative chain, I think it does mean that. I think you can have multiple causative chains. But in a causative chain, it means the particular supplier or property immediately before it gets to Millennium. And in this case, that was Apache. As I said before, the pipeline is a means of transportation like a road, like a bridge. Is this an Australian policy or an American policy? It's an American policy, Your Honor. You didn't write it, I hope. We absolutely did. That is one of the points I wanted to make crystal clear today, Your Honor. Millennium did not write one word of this policy. No, but, you know, Millennium's big, big boy. And they went out and sought bids on it. And they described the risk that they want covered. And they had negotiating power. I'm not sure if you get into that issue. But there is a problem on that. Well, Your Honor. How you construe it with a company who goes out and solicits coverage for a particular risk and gets bids from different companies and then accepts that. In talking about the contra preferentum doctrine, Your Honor, if we get to that, it's only because, one, we've determined that the policy is ambiguous. Two, we've determined that there is no extrinsic evidence to speak to the party's specific intent in entering into the contract. And then I think this might not have been clear in the briefs. Then we get to contra preferentum. And when we get to contra preferentum, we can talk about the sophisticated insured exception to the doctrine. But all we're talking about at that point is that the court is faced with a decision. And at that point, the court has to decide. Because there's nothing for a fact finder to decide, the court has to decide who does this language get construed against. And there is no authority cited by the insurers in this case that would lead to the conclusion. Would the binder be evidence to be considered? The binder. It may be that the binder is controlling. But if the binder is not controlling, then you guys haven't seemed to argue much about the binder. But it seems to me you could look at it as extra evidence, couldn't you? You absolutely could, Your Honor. And as Judge Hollander pointed out, if our dispute was over whether or not there was a direct requirement in the policies, we'd look to the binder. The binder would clearly evidence the intent of the parties. And we would realize that there is a direct requirement. But the binder. Direct supplier requirement. Well. It uses the word supplier, doesn't it? The binder does, Your Honor. OK. That's a little different. And the binder is a document. It's in the record. Our broker gave deposition testimony and said it outlines the coverage being sought. Then the insurers drafted the policy language. They are on form policies. A form AIG policy that extensive discovery was conducted on. It's in the record. The Joint Appendix at page 80. Plaintiff's Statement of Undisputed Material Fact 29. Where we laid out that these are AIG and STAR form policies. Millennium played no role in drafting them. In the briefs, the insurers intimate that Millennium had some role because of the binder. Because it requested CBI coverage for direct suppliers. That it somehow played a role in drafting the language of the policies. There's no authority to support such a jump. So as to contra preferendum. Once we get to that point, a decision has to be made under the law. Who the policy should be construed against. And there is no case that the insurers have cited. No case that I know of given these circumstances. That just because Millennium is a large company. That the policy drafted by the insurers. The endorsement number eight, which is at issue. A lengthy endorsement drafted by the insurers. There is no authority that would suggest that the doctrine of contra preferendum could be applied against Millennium in that situation. Just because it's a large company. The Pan Am case, in fact, which we cite in our briefs. And which the insurers refer to in their briefs. It speaks, I think, very clearly to the situation we're dealing with here. When the Second Circuit mentioned the fact that in situations where an insurer knows about a risk. Which the insurers in this case claim they knew about because of the ADM case. In those cases, if they don't draft clear policy language. Employing the doctrine of contra preferendum against the insurer is specially appropriate. According to the Second Circuit. I don't want to move you away from your doctrine necessarily. But I want to ask the question about the direct contributing properties. What do you maintain that would be in this case? Is the pipeline? Is Apache? What is it? Apache is the direct contributing property. And is that the same? I'm trying to put this in a context because thinking about gas and the way it moves out there. It really has different properties. I mean, it's a bunch of molecules going through a pipeline. But is it the same? Would the answer in this case be the same if this was a steel company? And you were getting iron ore from another company. And trucks were moving this iron ore from one place to the other. And the truck's actually owned by someone else. But then there's another party who actually takes part title to this iron ore that's going on. This iron ore plant blows up. Is the answer the same when it has to stop sending that iron ore to that steel company? I think the answer is the same. Because the fact that it's iron ore versus natural gas doesn't make a difference under the terms of our policies. Our policies merely refer to the disruption of the supply of a material. And that's based upon your determination that that fourth party I put in there, because the third party owns the trucks, does not constitute a direct contributing property? Not following completely on your answer. In other words, the direct contributing property is still that iron ore place. Not the persons who own the trucks or not the entity that is actually on the ore that's going. In that situation, Your Honor, if that situation were, if all the facts were the same as they are here, in other words, there's a, you know, a middleman that owns nothing, that does not operate the trucks, that does nothing but serves this purpose because of the way the distribution system is set up, that the policyholder has to contract with them. And their position in the chain of supply creates no risk. Then is that, I guess the point I'm getting at with that example is, is it's driven by the fact that pipeline cannot be moved. I mean, that pipeline is there. It's owned by someone else. It's a stationary thing. That truck could be diverted to other places. And you go on it and you say, oh, I don't want it to go there. I want to go somewhere else. Does that change the scenario? Not, I don't think, Your Honor, if the middlemen had this ability to, or they took on some risk that, in this situation, trying to think of all the facts Your Honor is putting forth, but in this situation, the person who owns the trucks, the company that owns the trucks, or the company that has contracts with the delivery mechanism, they're not a contributing property because their property is not contributing the material. I mean, if there was a loss, a damage to the pipeline, in this case, caused by whatever cause, it exploded, you wouldn't have any coverage for business loss? If there was a damage to the pipeline, I do not think that Millennium could make a claim for coverage under endorsement number eight to the policies. Because, as I said, the pipeline, as these policy, the words in these policies, the way they work. That's more proximate to Millennium's property than Apache. No more than a road outside of a policy. No more than a road, but it's still more proximate than Apache. You have a pipeline that blows up, and you're not getting gas, and you're down for three months, and you're saying you don't have any coverage. I think your client would be pretty surprised. But in that situation, Your Honor, the pipeline did not contribute the material to the policy holder. Why not? The pipeline was merely a mode of transportation. Sure, they could have, all they had to do was turn off the switch, Millennium wouldn't have gotten any gas. The policy does not speak in terms of modes of transportation being susceptible to disruption. It's direct contributing properties, and that's a property. It's the next contiguous property to Millennium's property. And it blows up. And you have business interruption three months, and you tell your client, sorry, you don't have any coverage. Under endorsement. If it blew up in Apache or blew up in China, on the pipeline coming from China, you'd have coverage. But because the explosion was in the pipeline right next to your property, you wouldn't have coverage. That's your argument. My argument, Your Honor, is if that claim came up and we analyzed the individual facts, we would have to determine if the pipeline qualifies. It'd be a different argument then, right? It may be, Your Honor. If the pipeline qualifies, the issue there would be whether or not the pipeline qualifies as a direct contributing property. I'm not sure that it does. I think that Millennium has a contract with the owner of the pipes, Alcoa, or someone. Once it puts it in that pipe, Apache does. Apache has a contract with Alcoa. So once it puts it in that pipe, it goes. There's no, is that the contract? If you will, I will put it in this pipe, and you will send it over to Millennium, or does Alenta have a contract with Alcoa that you will put it in this pipe? Apache has a contract with Alenta. Alenta has a contract with Millennium. Where's Alcoa come in? Is there a pipe? Alcoa is not part of this relationship. They don't own the pipe. I believe they might have an ownership interest, Your Honor. Who owns the pipe? I'm not 100% certain. I believe Alcoa has an ownership interest in it. I believe it changed ownership from maybe a state-owned. But again, Your Honor, this was never the focus of either the insurers or our argument below. The insurers never argued that the direct contributing property here was the pipeline. I see I'm out of time. Yeah, I think you are. You've gone through the red light. No ticket. Thank you, Your Honor. Thank you very much. Mr. Cole. I'm already out of time, so I'm going to say very little. First of all, to clarify the role of the binders, it appears on page 1914 of the joint appendix, the reply brief. The argument seemed to be made that the insurance policies weren't in effect, and there was an answer. Well, if the policies were in effect, certainly the binders were, and they say the same thing. And we carried that forward in a footnote in our brief, I think in our first brief, that pointed out the New York law saying the binder would control. But the language of the binder to us is the same, saying no indirect suppliers. And so we're dealing with filling in the meaning either way. And I don't think that makes it doesn't make a difference to the outcome. As to who owned the pipeline, it was Duet, D-U-E-T, owned 80%, and Alcoa owned 20%. As to contra preferendum and how that would apply here, I don't think we have to get to it, because the language, the meaning of direct is clear. But the Cummins case in New York says that when a sophisticated party requests terms in an insurance policy, we do not apply contra preferendum, because they are participating in the drafting in that sense. So that answers that question. And I think that's all I have time for. Thank you. Thank you, both of you. We'll adjourn the court signing die, and then we'll come down and recount. This honorable court stands adjourned on the signing of the die. God save the United States and this honorable court.
judges: Paul V. Niemeyer, G. Steven Agee, James A. Wynn Jr.